**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

| | | |
|---|---|---|
| STATE OF WISCONSIN,<br><br>*Petitioner*,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, Administrator,<br><br>*Respondents*. | ) | Case No. 25-1239 |

---

**CLEAN WISCONSIN AND SIERRA CLUB'S MOTION FOR LEAVE TO INTERVENE**

---

Pursuant to Federal Rule of Appellate Procedure 15(d) and 26(b), Clean Wisconsin and Sierra Club (collectively "Public Interest Organizations") respectfully submit this motion for leave to intervene ("Motion") as Respondent-Intervenors to defend the U.S. Environmental Protection Agency's ("EPA") final rule reclassifying the Milwaukee, Kenosha,[1] and Sheboygan nonattainment areas

[1] Kenosha County, Wisconsin, is part of the multi-state Chicago, IL-IN-WI nonattainment area. References to "Kenosha" throughout the Motion refer only to the Wisconsin portion of this nonattainment area.

(collectively the "Nonattainment Areas") from a Moderate to Serious classification because those areas failed to attain the 2015 Ozone National Ambient Air Quality Standards ("2015 Ozone Standard"). 89 Fed. Reg. 101901 (Dec. 17, 2024) (hereinafter "Reclassification Action").

EPA made an abrupt about-face and abandoned its defense of the Reclassification Action at the end of July. Unless the Court grants intervention to Public Interest Organizations, no party will defend the Action. Public Interest Organizations' members will suffer severe prejudice absent intervention, and the millions of people in the Nonattainment Areas will continue suffering from bad air quality unless the Reclassification Action can take effect.

The Reclassification Action correctly reclassified the Nonattainment Areas to Serious because those areas' air quality design values violated the 2015 Ozone Standard. Under the Clean Air Act ("Act"), EPA can only consider an area's design value to determine whether a nonattainment area has met the 2015 Ozone Standard. When EPA determined that the design values violated that standard, the Act compelled reclassification, by operation of law, to Serious. The Serious classification requires Wisconsin to take additional steps to reduce its ozone pollution by August 3, 2027.

The Public Interest Organizations advocate for the protection of their

members from the harms of ozone pollution in Wisconsin and the Nonattainment Areas. Their members are significantly harmed by persistently high ozone levels and have a particularized legal interest in defending the Reclassification Action, which would require additional ozone pollution cleanup.

Public Interest Organizations are entitled to intervention as of right because: (1) this Motion is timely under the circumstances; (2) granting intervention will not unduly prejudice any existing party because the case is still in its early stages; (3) Public Interest Organizations' legally protectable interests in improved air quality in Wisconsin will be severely impaired if this Motion is denied, and (4) no party can adequately represent Public Interest Organizations' interests, especially now that EPA has abandoned the Reclassification Action. If this Court determines that Public Interest Organizations are not entitled to intervention as of right, they would be entitled to permissive intervention.

Petitioner State of Wisconsin and Respondent EPA oppose this Motion.

## BACKGROUND

### I. Ozone Regulation Under the Clean Air Act.

The Clean Air Act directs EPA to establish National Ambient Air Quality Standards ("NAAQS") to safeguard public health from dangerous air pollution, including ozone, and requires states to take the actions necessary to attain and

maintain those standards. *Murray Energy Corp. v. EPA*, 936 F.3d 597, 604 (D.C. Cir. 2019) (upholding the 2015 Ozone Standard). Ground-level ozone—commonly known as smog—forms when volatile organic compounds ("VOCs") and nitrogen oxides ("NOx") react together in sunlight. *Id.* at 605. These so-called ozone precursors are emitted from stationary sources of air pollution, such as power plants and industrial facilities, and mobile sources, such as light- and heavy-duty vehicles and off-road vehicles. *See id.*

Ozone pollution causes a slew of harmful short-term and long-term health effects, as documented by voluminous scientific research and studies spanning the past several decades. *See* 80 Fed. Reg. 65292, 65302 (Oct. 26, 2015) (documenting the breadth of public health research on ozone pollution in support of EPA's final rule adopting the 2015 Ozone Standard). Short-term exposure to ozone pollution can damage the lungs, causing breathing problems, asthma attacks, and increased hospital visits; repeated exposure over time contributes to ongoing and long-term respiratory injury and a heightened risk of premature death, especially among children, older adults, and people with respiratory disorders. *Id.* at 65303-11.

When areas of the country are not meeting the 2015 Ozone Standard, like the three Nonattainment Areas at issue here, the Clean Air Act has a "graduated classification scheme" that classifies these areas as either Marginal, Moderate,

Serious, Severe, or Extreme. *Sierra Club v. EPA*, 47 F.4th 738, 741 (D.C. Cir. 2022); 42 U.S.C. § 7511(a)(1). Under this scheme, each time a nonattainment area fails to attain an ozone standard by its required attainment date, the area is "bumped" to a higher classification by operation of law, and the requirements of higher classifications build upon the requirements of lower classifications. 42 U.S.C. § 7511(b)(2); *Nat. Res. Def. Council v. EPA*, 777 F.3d 456, 460 (D.C. Cir. 2014) ("[A]reas that fail to attain the NAAQS by the statutory deadline are automatically reclassified to the next highest classification."). Thus, as an area continues to have poor air quality, the state will have to integrate increasingly rigorous air quality protective measures in its state implementation plan ("SIP") to reduce the area's air pollution. *Sierra Club*, 47 F.4th at 741.

## II. EPA's Reclassification Action and Wisconsin's History of Noncompliance in the Milwaukee, Kenosha, and Sheboygan Nonattainment Areas.

In 2015, EPA promulgated the 2015 Ozone Standard at 70 parts per billion. 80 Fed. Reg. 65292. This triggered the requirement for EPA to designate areas of the country as nonattainment, attainment, or unclassifiable under the new Ozone Standard. 42 U.S.C. § 7407(d). In 2018, EPA designated parts of Sheboygan, Kenosha, Milwaukee, and Ozaukee Counties as nonattainment. 83 Fed. Reg. 25776 (June 4, 2018). In response to a successful Clean Wisconsin challenge to those

designations as arbitrary and too small geographically, EPA expanded the geographic scope of the Wisconsin nonattainment areas. *See* 86 Fed. Reg. 31438 (June 14, 2021); *see also Clean Wisconsin v. EPA*, 964 F.3d 1145 (D.C. Cir. 2020).

The three Wisconsin Nonattainment Areas have repeatedly failed to attain the 2015 Ozone Standard. The Areas were first designated as nonattainment with a "Marginal" classification in 2018 and an attainment deadline of August 3, 2021. 83 Fed. Reg. 25776, 25845 (June 4, 2018). The Areas failed to meet the 2015 Ozone Standard by the Marginal attainment deadline and were automatically reclassified by operation of law to Moderate, with a new attainment deadline of August 3, 2024. 87 Fed. Reg. 60897, 60925 (Oct. 7, 2022). The Areas again failed to attain the standard by the Moderate deadline and were subsequently reclassified by operation of law to Serious in the challenged Reclassification Action, with a new attainment deadline of August 3, 2027. 89 Fed. Reg. at 101905.

The Clean Air Act provides that EPA can only consider an area's design value to determine compliance with the NAAQS. 42 U.S.C. § 7511(b)(2)(A). A design value is the average of the fourth-highest 8-hour concentration of ozone in a year, averaged over a 3-year period, meaning that attainment must occur no later than December 31 of the year prior to the attainment date. *See* 40 C.F.R. Part 50,

Appendix I. That means EPA looked at the 2021-2023 design value[2] for the Wisconsin Areas to determine compliance with the attainment deadline of August 3, 2024. The table below shows the calculations for select monitors in the three Nonattainment Areas' 2023 design values in EPA's Reclassification Action: [3]

| AQS Site ID | Nonattainment Area (County) | Fourth highest daily maximum 8-hour average ozone concentration (ppb) | | | 2021-2023 design value (DV) (ppb) |
|---|---|---|---|---|---|
| | | 2021 | 2022 | 2023 | |
| 55-117-0006 | Sheboygan | 73 | 77 | 82 | **77** |
| 55-079-0085 | Milwaukee | 72 | 74 | 76 | **74** |
| 55-059-0019 | Kenosha | 79 | 70 | 84 | **77** |

On December 17, 2024, because the 2023 design values for each area violated the 2015 Ozone Standard, EPA determined that the Areas had failed to attain by the August 3, 2024, deadline. 89 Fed. Reg. at 101905. The Clean Air Act thus compelled only one possible outcome: reclassify the Nonattainment Areas to Serious. 42 U.S.C. § 7511(b)(2). The upcoming Serious attainment deadline is August 3, 2027. 89 Fed. Reg. 101901, 101902.

[2] For simplicity, the remaining references to the design value in this Motion will be just to the last year of the three-year calculation. So a "2023 design value" means the design value comprised of the years 2021, 2022, and 2023.
[3] Reclassification Action, Tables 4, 6, and 8. *See* 89 Fed. Reg. at 101904-05.

## III. Air Quality Continues to Deteriorate in the Three Nonattainment Areas.

About one-third of Wisconsin residents live in the counties comprising the three Nonattainment Areas. Gallagher Decl. ¶ 14, Ex. A. In the Reclassification Action, EPA relied on "certified" air quality data, which refers to the data submitted by Wisconsin—data which the State lead official must attest is "accurate to the best of her or his knowledge." 89 Fed. Reg. 101901; 40 C.F.R. § 58.15(a). More recent, Wisconsin-certified air quality data since 2023 shows that ozone pollution levels in these areas are worsening. Gallagher Decl. ¶¶ 19-21. The graph and table below show ozone design value trends for the three Nonattainment Areas from 2019 through 2025, based on EPA's Ozone Watch tool.[4] Gallagher Decl. ¶¶ 19-21.

[4] U.S. EPA, OZONE WATCH, https://www.epa.gov/outdoor-air-quality-data/ozone-watch (last accessed August 25, 2026).




| AQS Site ID | Nonattainment Area (County) | Design Value (ppb) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2017-2019 | 2018-2020 | 2019-2021 | 2020-2022 | 2021-2023 | 2022-2024 | 2023-2025 |
| 55-117-0006 | Sheboygan | 75 | 75 | 72 | 75 | 77 | 78 | 77 |
| 55-059-0019 | Kenosha | 75 | 74 | 74 | 75 | 77 | 78 | 79 |
| 55-079-0085 | Milwaukee | 69 | 70 | 70 | 73 | 74 | 74 | 74 |
| 55-101-0020[5] | Racine | 74 | 73 | 73 | 75 | 74 | 74 | 76 |

[5] In response to the D.C. Circuit's 2020 partial vacatur of EPA's designations for Wisconsin, EPA drew a larger boundary for the Milwaukee nonattainment area to include Racine County, which is where AQS Site ID 55-101-0020 is located (Racine - Payne And Dolan, 4500 Charles St.). 86 Fed. Reg. 31438 (June 14, 2021).

Based on EPA's Benefits Mapping and Analysis Program ("BenMAP"), the public health costs associated with 2015 Ozone Standard violations are significant in the three areas. Ozone levels above the federal standard in these three Nonattainment Areas result in 2 to 4 excess deaths per year and health harms ranging from $88,600,000 to $112,000,000 annually. Gallagher Decl. ¶¶ 15-16.

### IV. Procedural History

On February 14, 2025, the State of Wisconsin filed the instant petition for review, seeking vacatur of EPA's Reclassification Action. On July 28, 2026, EPA announced to the Court that it had granted Wisconsin's request for reconsideration (submitted on July 16, 2026) of the Reclassification Action and requested putting this case in abeyance, meaning that EPA is no longer defending the Action. Public Interest Organizations seek to defend the Reclassification Action so that its required pollution reductions can be implemented before the August 3, 2027, attainment deadline.

## STANDARD OF REVIEW

Rule 15(d) of the Federal Rule of Appellate Procedure ("FRAP") permits intervention in petitions for review challenging agency action, and this Court routinely approaches intervention under FRAP 15(d) like intervention under Federal Rule of Civil Procedure ("FRCP") 24. *Sierra Club v. EPA*, 358 F.3d 516,

517-18 (7th Cir. 2004). Under FRCP 24, "intervention may be as of right or it may be permissive." *Heartwood, Inc. v. United States Forest Serv.*, 316 F.3d 694, 700 (7th Cir. 2003); FRCP 24(a).

To intervene as a matter of right, movants must satisfy the following four requirements: (1) the application must be timely; (2) the applicant must claim an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) existing parties must not be adequate representatives of the applicant's interest. *Heartwood*, 316 F.3d at 700.

For permissive intervention, a request must be timely, raise a claim or defense sharing a common question of law or fact with the main action, and show that intervention will not unduly delay or prejudice adjudication of the original parties' rights. FRCP 24(b).

## ARGUMENT

### I. Clean Wisconsin and Sierra Club are Entitled to Intervene as of Right to Defend the Reclassification Action.

#### A. The Motion to Intervene is Timely.

Although FRAP 15(d) generally requires that a motion to intervene be filed within 30 days of the petition for review, that deadline is non-jurisdictional and

appellate courts can excuse it. *Zeigler Coal Co. v. Off. of Workers' Comp. Programs*, 490 F.3d 609, 610 n.1 (7th Cir. 2007) (finding good cause to grant late intervention under Rule 15(d) even when motion to intervene was filed over a year after petition for review was filed and case had been argued); *Int'l Union of Operating Eng'rs, Loc. 18 v. NLRB*, 837 F.3d 593, 596 (6th Cir. 2016) (FRAP 15(d)'s "thirty-day filing deadline is a claim-processing rule that the courts of appeals can excuse.").

Appellate courts "retain authority to waive [the 30-day period] or, for that matter, to permit the parties to waive them." *Int'l Union of Operating Eng'rs*, 837 F.3d at 595. For example, the Fifth Circuit permits intervention up to 14 days before the due date for the brief of the party the intervenor seeks to support, reflecting the view that intervention can be appropriate well after the filing of the petition for review. 5th Cir. Loc. R. 15.5.

In addition, FRAP 26(b) allows Courts to extend any non-jurisdictional deadline, including FRAP 15(d), for "good cause." *See* 16AA WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 3961.4 (5th ed.) ("It would seem that Federal Rule of Appellate Procedure 26(b) empowers the court to extend the time to intervene under Rule 15(d)"); *Zeigler Coal*, 490 F.3d at 610 n.1 ("St. Paul showed good cause to intervene because, until our decision in *Old Ben*, St. Paul had no

reason to believe that intervention was necessary to protect this interest.”).

The policies underlying FRCP 24 instruct that timeliness is judged by the circumstances of each case. *Ali v. City of Chicago*, 34 F.4th 594, 599 (7th Cir. 2022) (explaining that intervention timeliness “is not limited to chronological considerations but is to be determined from all the circumstances”); *see also Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (“The requirement of timeliness is not a tool of retribution to punish the tardy would-be intervenor, but rather a guard against prejudicing the original parties by the failure to apply sooner.”). Therefore, these cases stand for the general premise that “[f]ederal courts should allow intervention where no one would be hurt and greater justice could be attained.” *Espy*, 18 F.3d at 1205; *see also Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm’n*, 834 F.3d 562, 565 (5th Cir. 2016) (“The timeliness inquiry is contextual; absolute measures of timelines should be ignored.”).

This Court has identified four factors that guide the timeliness inquiry for intervention under FRCP 24: (1) the length of time the intervenor knew or should have known of their interest in the case; (2) the prejudice to the intervenor if the motion is denied; (3) the prejudice caused to the original parties by the delay; and (4) any other unusual circumstances. *Lopez-Aguilar v. Marion Cnty. Sheriff’s Dep’t*, 924 F.3d 375, 388 (7th Cir. 2019). Public Interest Organizations’

intervention request is timely under all four factors.

### 1. Public Interest Organizations Acted Promptly To Intervene When It Became Apparent That Their Legal Interests Were Not Adequately Represented In This Case.

Clean Wisconsin and Sierra Club have long-standing organizational and legal interests in protecting air quality for their members located in the Nonattainment Areas, including ensuring that sources in these Areas are subject to the most stringent emissions limits required by their nonattainment classification. Gallagher Decl. ¶¶ 4-5, 7-8; Kelly Decl. ¶¶ 3-9, Ex. B; Ward Decl. at ¶¶ 4-12, Ex. F.

The Public Interest Organizations acknowledge that intervention as of right requires consideration of whether existing parties adequately represent the applicants' interests. Therefore, they carefully consider which cases to intervene in, paying particular attention to whether EPA is defending the challenged action. It does not serve judicial economy for organizations to intervene in cases from the outset when it appears that the existing parties to the case may adequately represent their interests. *Espy*, 18 F.3d at 1206 ("Courts should discourage premature intervention that wastes judicial resources."). Up until July 28, 2026, it seemed that EPA planned to defend the Reclassification Action. After this Court's March 2026 order requiring the parties to brief the case, EPA took affirmative steps towards its

continued defense of the Action, such as filing the certified list of the administrative record on April 27, 2026. ECF No. 28. The Public Interest Organizations reasonably viewed EPA's then-ongoing defense of the Reclassification Action as adequately protecting interests in this case. For that reason, there was little basis for them to seek intervention until recently.

That changed on July 28, 2026, when EPA and Wisconsin jointly announced to the Court and the public that EPA had granted a reconsideration request, which Wisconsin had only submitted a few days prior on July 16, 2026, and sought abeyance of this case. ECF No. 29 ¶¶ 2-3. Thus, it was not until July 28, 2026, that the Public Interest Organizations knew or should have known that their interests would not be adequately represented by EPA. *Espy*, 18 F.3d at 1206 ("A better gauge of promptness is the speed with which the would-be intervenor acted when it became aware that its interests would no longer be protected by the original parties.").

This Court has allowed late intervention in similar circumstances, and even when substantial briefing and argument had already occurred and a decision had already been rendered on the merits. In *Flying J, Inc. v. Van Hollen*, this Court held that a trade association could intervene after final judgment when the Wisconsin Attorney General, who had been defending a state statute, abandoned its

defense of the statute. 578 F.3d 569 (7th Cir. 2009). The Court explained that intervention was timely because the movant reasonably relied on the attorney general to defend its interests until he "threw in the towel." *Id*. at 570. Once the government ceased defending the law, any potential justification for excluding the movant from the case disappeared. *Id*. at 572. The Court concluded that allowing intervention would not prejudice the existing parties because they had no reasonable expectation that the government would cease defending the case. *Id*. at 573-74

Here, like the Wisconsin Attorney General's change in position in *Flying J,* EPA's surprise decision to abandon the Reclassification Action has fundamentally changed the litigation's posture. There was no indication EPA would change positions, and it had in fact taken steps just a few months ago by filing the certified list to the administrative record in furtherance of its defense. Moreover, the reconsideration request EPA acted on was not submitted by Wisconsin until the eve of briefing, on July 16, 2026. Granting intervention is even more appropriate here because this case is at a far earlier stage than in *Flying J*. Here, no merits briefing, argument, nor decision on the merits has occurred. As a result, intervention would cause even less disruption to these proceedings than it did in *Flying J*.

Granting intervention here would be consistent with cases from other circuits, like *Flying J*, recognizing that intervention may become necessary when the government changes course during litigation. In *Espy*, the Fifth Circuit allowed timber companies to intervene in a case brought five years earlier challenging U.S. Forest Service-issued timber sales. 18 F.3d at 1206. There the court reasoned that the companies did not "bec[o]me aware that the Forest Service would not protect their interests" until the agency announced that it would apply an adverse preliminary injunction to all timber sales. *Id*. Thus, the court held that the motion to intervene (filed two months after the Forest Service's announcement) was timely under the circumstances. *Id*. at 1205-06.

The present case is similar, except this Motion is being filed even sooner—within one month of EPA's announcement that it is no longer defending the Reclassification Action. *See also Smith v. Los Angeles Unified Sch. Dist*., 830 F.3d 843, 859 (9th Cir. 2016) (holding late intervention motion was timely when filed "approximately one year after the change in circumstances prompting" the motion and "only weeks after definitively learning that their interests were not adequately represented by the existing parties."). Filing within one month of EPA's announcement is also consistent with the spirit of FRAP 15(d).

### 2. Denying Public Interest Organizations' Intervention Will Inflict Substantial Harm On Them and Their Members.

The Public Interest Organizations and their members' legal interests in the Reclassification Action will be seriously injured if the Court does not grant intervention, especially now that EPA has abandoned its defense of the Action. *Infra* ARGUMENT § I.B. The Nonattainment Areas are home to thousands of the organizations' members, who all continue to suffer harm from high ozone pollution. Kelly Decl. ¶ 11; Ward Decl. ¶ 14. For example, Clean Wisconsin member Rebecca Clarke notices that, when ozone levels are high, she must stop taking walks with her dogs, gardening, and visiting Lake Michigan's beaches and instead take refuge indoors because "physical activities that are normally easy become significantly more difficult." Clarke Decl. ¶¶ 15-18, Ex. C. "On days when ozone levels are high, I experience a heaviness in my chest, breathing difficulties, and an unusually fast heartbeat." *Id*. ¶ 16. These and other ongoing harms afflicting Public Interest Organizations' members are real and concrete. *See* Hillringhouse Decl. ¶¶ 4-7, 15-18, Ex. G; Radke Decl. ¶¶ 7-11, Ex. D; Ritger Decl. ¶¶ 5-10, Ex. E.

The Reclassification Action, if the stay is lifted, could remedy these members' injuries because it will require Wisconsin to take steps to reduce emissions of ozone precursors in the three Nonattainment Areas. Clarke Decl. ¶¶

14-26; Hillringhouse Decl. ¶¶ 4-7, 15-18; Radke Decl. ¶¶ 9-13; Ritger Decl. ¶¶ 5-10. The Reclassification Action is particularly necessary now to help these members because the ozone levels in the three Areas are getting worse. *Supra* BACKGROUND § III; Gallagher Decl. ¶¶ 19-21. Compounding the need for immediate action, the attainment deadline is less than a year away—August 3, 2027—and any further delay to resolving this case will continue to inflict substantial harm and prejudice to the Public Interest Organizations' members, absent intervention.

The health harms to the organizations' members and others living in the Nonattainment Areas are significant. For example, due to ozone levels above the 70 parts-per-billion standard, an average of 2 to 4 excess deaths occur <u>per year</u> in these areas. Gallagher Decl. ¶¶ 15-16. And the public health harms from this excess pollution range from $88,600,000 to $112,000,000 <u>per year</u>. *Id*. There is a real, human cost to the ongoing air quality problems in these areas, and "greater justice" can be obtained by allowing Public Interest Organizations to intervene. *See Espy*, 18 F.3d at 1205 ("Federal courts should allow intervention where no one would be hurt and greater justice could be attained.").

### 3. Granting Intervention Prejudices No Existing Party.

No party will be prejudiced by the Public Interest Organizations'

participation in this case. The parties have not filed briefs, nor is a schedule set. Thus, the case is in the same place it would have been if intervention had been sought earlier. Moreover, Wisconsin filed its petition for review with the expectation that it would have to expend resources prosecuting this case to the end, so it cannot claim prejudice having to do so now. *See Flying J*, 578 F.3d at 573-74 (discussing the petitioner's reasonable assumption of the costs of litigation and a subsequent appeal when seeking review of a rule). Wisconsin could not have relied on EPA's abandonment of the Reclassification Action, so the State suffers no prejudice to continue its legal challenge if intervention is granted. *Id*. at 574. EPA is also not prejudiced by intervention because, either way, it would have had to defend the Reclassification Action.

### B. The Public Interest Organizations and their Members Have Concrete and Substantial Demonstrated Interests in this Case.

The Public Interest Organizations have a clear interest in the disposition of this action, supporting this request for intervention to defend the Reclassification Action. Roughly 850 Clean Wisconsin and 1900 Sierra Club members live in the three Nonattainment Areas and near ozone precursor-emitting stationary sources that would be subject to more stringent pollution restrictions by the Reclassification Action, and those members would significantly benefit from reduced ozone pollution in the region. *Supra* ARGUMENT § I.A.2; *see* Ward Decl. ¶

14; Hillringhouse Decl. ¶¶ 4-7, 15-18; Kelly Decl. ¶¶ 9-14; Gallagher Decl. ¶¶ 15-16, 23; Clarke Decl. ¶¶ 14-26; Radke Decl. ¶¶ 7-11; Ritger Decl. ¶¶ 5-10.

The Public Interest Organizations have long histories of air quality advocacy in Wisconsin and have a vested interest in ensuring that the Reclassification Action can take effect and be upheld. Ward Decl. ¶¶ 6-9, 12; Kelly Decl. ¶¶ 6-7.

Clean Wisconsin is a nonprofit, public interest organization founded in Wisconsin in 1970. Kelly Decl. ¶¶ 3, 6. The organization's mission is to be a voice for Wisconsin's environment, working to preserve and protect Wisconsin's clean air, clean water, and natural heritage. *Id*. ¶ 6-7. This work includes engaging on a wide range of issues in several venues, including state and federal courts, on matters that support and protect the natural resources and the health of all Wisconsinites. *Id*.

Sierra Club is a nonprofit, public interest organization committed to protecting its members from the effects of harmful air pollution and has a significant interest in shielding its members from harms that would result if the Reclassification Action were vacated. With over 15,000 members in Wisconsin, Sierra Club is a long-time advocate of improving air quality, including the reduction of ozone precursors. Ward Decl. ¶¶ 6-9, 14. This includes past efforts to "inform the public about the health impacts of ozone pollution" while also

"advocat[ing] for strong implementation of the ozone NAAQS" and associated air pollution control measures. Ward Decl. ¶ 9. The Reclassification Action will directly affect industrial stationary sources of ozone air pollution, including six specific plants: the Oak Creek Power Plant, Elm Road Generating Station, Edgewater Generating Station, and the developing Paris Generating Station, South Oak Creek CT, and Red Oak Ridge Energy Center. Ward Decl. ¶ 12. These plants contribute to poor air quality in parts of the state where Sierra Club members live, work, and recreate. *See* Hillringhouse Decl. ¶¶ 2-7 (declarant lives about two miles from Oak Creek Power Plant).

If the Reclassification Action is upheld, the Public Interest Organizations' members in the Nonattainment Areas will be exposed to less ozone pollution. For example, under a Serious classification, stricter obligations known as "reasonably available control technologies" would apply to all sources emitting greater than 50 tons per year of ozone precursors, whereas right now they only apply to sources emitting 100 tons or greater under the Moderate classification. 42 U.S.C. § 7511a(c). The Reclassification Action will lead to less ozone pollution compared to the status quo.

If the Reclassification Action were vacated, the Public Interest Organizations' members, who already suffer ongoing injuries from high ozone

levels, would continue suffering these irreversible harms to their health and their use and enjoyment of outdoor spaces. *See* Hillringhouse Decl. ¶¶ 4-7, 15; Clarke Decl. ¶¶ 14-23; Radke Decl. ¶¶ 7-11; Ritger Decl. ¶¶ 5-10. Ozone is linked to asthma attacks, reduced lung function, chronic obstructive pulmonary disease exacerbations, cardiovascular disease, strokes, pregnancy complications, neurotoxicity, and premature death. Gallagher Decl. ¶ 13; *supra* BACKGROUND § I. Ozone is particularly dangerous for those who already suffer from respiratory illnesses as well as other sensitive populations including the elderly and children. Gallagher Decl. ¶ 13; *supra* BACKGROUND § I; Hillringhouse Decl. at ¶¶ 6-7; Ritger Decl. ¶¶ 5-10.

The Public Interest Organizations' members already experience ozone-related harms in the Nonattainment Areas, which will worsen unless the Reclassification Action can take effect. Not only are the ozone levels in the three Nonattainment Areas getting worse, Gallagher Decl. ¶¶ 19-21, but the American Lung Association reported that for the year 2026, the Sheboygan and Milwaukee-Racine-Waukesha areas were in the top 25 most ozone polluted cities/metropolitan areas in the country.[6] The poor air quality conditions in these regions expose

---

[6] American Lung Ass'n, State of the Air 2026, Ozone Pollution Trends (Jun. 9, 2025), https://www.lung.org/research/sota/key-findings/ozone-pollution.

Public Interest Organizations' members to harmful air quality and force them to reduce or cease outdoor activities that they enjoy. *See* Hillringhouse Decl. ¶¶ 6-7; Clarke Decl. ¶¶ 14-23; Radke Decl. ¶¶ 7-11; Ritger Decl. ¶¶ 5-10. The harms these members experience from ozone pollution—and the benefits from the Reclassification Action should it be affirmed—would also establish standing, which is analogous to showing a legal interest sufficient to justify intervention as of right. *See, e.g., Sierra Club v. EPA*, 774 F.3d 383, 392-93 (7th Cir. 2014) (holding that Sierra Club has standing to challenge EPA's redesignation of ozone nonattainment area).

### C. Disposition of the Case May Impair or Impede the Public Interest Organizations' Ability to Protect their Interest.

The Public Interest Organizations' and their members' interests will be adversely impacted unless permitted to intervene in this litigation and defend the Reclassification Action. FRCP 24(a)(2). The D.C. Circuit has stated that a "possibility" of impairment is a "sufficient showing" for intervention under Rule 24(a)(2). *Foster v. Gueory*, 655 F.2d 1319, 1325 (D.C. Cir. 1981). That impairment is guaranteed to continue unless intervention is granted because EPA has now abandoned the Reclassification Action, leaving no recourse for the worsening air quality afflicting the organizations' members.

Over twenty months have passed since EPA issued the Reclassification

Action and there are now less than twelve months until the August 3, 2027, attainment date. Time is running out for Wisconsin to take meaningful actions to reduce pollution by that fast-approaching attainment deadline, after which the Nonattainment Areas will be reclassified to Severe. The longer this case is delayed and the Action stayed, the longer irreversible ozone pollution impacts will continue. The only way to obtain much-needed ozone pollution reductions as soon as possible is to allow the Public Interest Organizations to intervene.

### D. Existing Parties Cannot Adequately Represent Clean Wisconsin and Sierra Club's Interests.

Neither Wisconsin nor EPA can adequately represent the Public Interest Organizations' interests. As discussed above, the Public Interest Organizations and their members have a strong interest in abating ozone pollution in the region, and the Reclassification Action supports that goal. The State's continued attempts to avoid its obligations under the Clean Air Act certainly do not support those interests. And EPA's recent decision to grant reconsideration of the Reclassification Action and thereby abandon its defense of the Reclassification Action means that no party in this case adequately represents Public Interest Organizations' interest.

## II. Alternatively, the Public Interest Organizations Should be Granted Permissive Intervention.

If this Court determines that the Public Interest Organizations are not entitled to intervene as of right, there is a valid basis for permissive intervention. If the moving party's "claim[s] or defense[s] and the main action have a question of law or fact in common," this Court may grant an intervention request where the "application was timely" and where "intervention will [not] unduly delay or prejudice the adjudication of the rights of the original parties." FRCP 24(b); *Heartwood, Inc.*, 316 F.3d at 701.

Here, the Public Interest Organizations meet the requirements for permissive intervention. First, this request is timely under the circumstances. *Supra* ARGUMENT § I.A. Second, this Motion will not unduly delay or prejudice any other party's rights. *Supra* ARGUMENT § I.A.3. The Public Interest Organizations will raise arguments in defense of the Reclassification Action that necessarily share questions of law and fact in common with the underlying action and relate to the Public Interest Organizations' interest in the outcome of this case. Therefore, the Court should grant the Public Interest Organizations permissive intervention, if not intervention as of right.

## CONCLUSION

For the foregoing reasons, the Public Interest Organizations respectfully

request that this Court grant their Motion to Intervene to defend the Reclassification Action.

Dated: August 27, 2026

*/s/ Jeffrey Hammons*
Jeffrey Hammons
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(771) 241-6481
jhammons@catf.us

*Counsel for Respondent-Intervenor Applicant Clean Wisconsin*

*/s/ Priyam Desai*
Priyam Desai
Sierra Club
2101 Webster St., Ste. 1300
Oakland, CA 94612
(415) 294-0910
priyam.desai@sierraclub.org

*Counsel for Respondent-Intervenor Applicant Sierra Club*

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the type-volume limitation of Federal Rules of Appellate Procedure 27(d)(1)-(2) because, excluding the parts exempted under Federal Rules of Appellate Procedure 27(d)(2) and 32(f), it contains 5142 words. Per Federal Rule of Appellate Procedure 27(d)(1)(E), I certify that this motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New York Times font. I further certify that this motion has been scanned for viruses and is virus-free.

Dated: August 27, 2026

*/s/ Jeffrey Hammons*
Jeffrey Hammons
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(771) 241-6481
jhammons@catf.us

**CERTIFICATE OF SERVICE**

I certify that on August 27, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*/s/ Jeffrey Hammons*
Jeffrey Hammons
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(771) 241-6481
jhammons@catf.us