**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

| | | |
|---|---|---|
| STATE OF WISCONSIN,<br><br>*Petitioner*,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, Administrator,<br><br>*Respondents*. | ) | Case No. 25-1239 |

---

**CLEAN WISCONSIN AND SIERRA CLUB'S CONTINGENT MOTION TO DISSOLVE STAY, FOR SUMMARY DISPOSITION OR, IN THE ALTERNATIVE, EXPEDITED BRIEFING, AND TO LIFT THE ABEYANCE**

---

Pursuant to Federal Rule of Appellate Procedure 26, and contingent on the Court granting their pending intervention request,[1] Clean Wisconsin and Sierra Club (collectively "Public Interest Organizations") respectfully submit this motion ("Motion") to dissolve the judicial stay of the U.S. Environmental Protection

[1] ECF No. 31.

Agency's ("EPA") final rule reclassifying the Milwaukee, Kenosha,[2] and Sheboygan nonattainment areas (collectively the "Nonattainment Areas") from a Moderate to Serious classification because those areas failed to attain the 2015 Ozone National Ambient Air Quality Standards ("2015 Ozone Standard"). 89 Fed. Reg. 101901 (Dec. 17, 2024) (hereinafter "Reclassification Action"). All factors that this Court would consider in determining whether to continue the stay favor dissolution.

First, the State of Wisconsin's challenge has no chance of success on the merits. Second, the Public Interest Organizations' members are and will continue to be irreparably harmed by worsening ozone pollution if this Court maintains the stay. Third, the public interest supports dissolution of the stay because air quality in the Nonattainment Areas has been exceeding the federal standards for years and likely will get worse without the Reclassification Action. Finally, neither Wisconsin nor EPA will be substantially injured if the stay were lifted.

This motion also seeks summary affirmation of the Reclassification Action and summary dismissal of the petition for review because Petitioner Wisconsin's challenge so clearly lacks merit that summary disposition is appropriate. Under the

---

[2] Kenosha County, Wisconsin, is part of the multi-state Chicago, IL-IN-WI nonattainment area. References to "Kenosha" throughout the Motion refer only to the Wisconsin portion of this nonattainment area.

Clean Air Act ("Act"), determinations of compliance with ozone standards are based exclusively on the air monitoring data, meaning that only one outcome was possible after the Nonattainment Areas failed to meet the 2015 Ozone Standard by the August 3, 2024, attainment deadline: the automatic reclassification, by operation of law, of the Areas to Serious. Wisconsin certified that the air monitoring data was accurate and does not dispute it. Thus, none of the issues that Wisconsin raises (or could raise) can change the outcome the Act compelled here.

Dissolving the stay and dismissing the petition for review ensures that the much-needed pollution reductions required by the Reclassification Action can take effect as soon as possible. To the extent the Court deems this dispute ready for briefing but not summary disposition, this motion requests, in the alternative, expedited briefing and argument. The next attainment date of August 3, 2027, is fast approaching, so resolution is needed now if the Areas have any hope for meaningful emission reductions before then.

To the extent the Court deems it necessary to effectuate the above requested relief, this motion also seeks to have the abeyance lifted for purposes of granting all relief the Court deems appropriate.

Petitioner State of Wisconsin will oppose this Motion. Respondent EPA reserves its position on the Motion.

## BACKGROUND

### I. Ozone Regulation Under the Clean Air Act

The Clean Air Act directs EPA to establish National Ambient Air Quality Standards ("NAAQS") to safeguard public health from dangerous air pollution, including ozone, and requires states to take the actions necessary to attain and maintain those standards. *Murray Energy Corp. v. EPA*, 936 F.3d 597, 604 (D.C. Cir. 2019) (upholding the 2015 Ozone Standard). Ground-level ozone—commonly known as smog—forms when volatile organic compounds ("VOCs") and nitrogen oxides ("NOx") react together in sunlight. *Id.* at 605. These so-called ozone precursors are emitted from stationary sources of air pollution, such as power plants and industrial facilities, and mobile sources, such as light- and heavy-duty vehicles and off-road vehicles. *See id.*

Ozone pollution causes a slew of harmful short-term and long-term health effects, as documented by voluminous scientific research and studies spanning the past several decades. *See* 80 Fed. Reg. 65292, 65302 (Oct. 26, 2015) (documenting the breadth of public health research on ozone pollution in support of EPA's final rule adopting the 2015 Ozone Standard). Short-term exposure to ozone pollution can damage the lungs, causing breathing problems, asthma attacks, and increased hospital visits; repeated exposure over time contributes to ongoing and long-term

respiratory injury and a heightened risk of premature death, especially among children, older adults, and people with respiratory disorders. *Id.* at 65303-11.

When areas of the country are not meeting the 2015 Ozone Standard, like the three Nonattainment Areas at issue here, the Clean Air Act has a "graduated classification scheme" that classifies these areas as either Marginal, Moderate, Serious, Severe, or Extreme. *Sierra Club v. EPA*, 47 F.4th 738, 741 (D.C. Cir. 2022); 42 U.S.C. § 7511(a)(1). Under this scheme, each time a nonattainment area fails to attain an ozone standard by its required attainment date, the area is "bumped" to a higher classification by operation of law, and the requirements of higher classifications build upon the requirements of lower classifications. 42 U.S.C. § 7511(b)(2); *Nat. Res. Def. Council v. EPA*, 777 F.3d 456, 460 (D.C. Cir. 2014) ("[A]reas that fail to attain the NAAQS by the statutory deadline are automatically reclassified to the next highest classification."). Thus, as an area continues to have poor air quality, the state will have to integrate increasingly rigorous air quality protective measures in its state implementation plan ("SIP") to reduce the area's air pollution. *Sierra Club*, 47 F.4th at 741.

## II. EPA's Reclassification Action and History of Noncompliance in the Milwaukee, Kenosha, and Sheboygan Nonattainment Areas.

In In 2015, EPA promulgated the 2015 Ozone Standard at 70 parts per billion. 80 Fed. Reg. at 65292. This triggered the requirement for EPA to designate

areas of the country as nonattainment, attainment, or unclassifiable under the new Ozone Standard. 42 U.S.C. § 7407(d). In 2018, EPA designated parts of Sheboygan, Kenosha, Milwaukee, and Ozaukee Counties as nonattainment. 83 Fed. Reg. 25776 (June 4, 2018). In response to a successful Clean Wisconsin challenge to those designations as arbitrary and too small geographically, EPA expanded the geographic scope of the Wisconsin nonattainment areas. *See* 86 Fed. Reg. 31438 (June 14, 2021); *see also Clean Wisconsin v. EPA*, 964 F.3d 1145 (D.C. Cir. 2020).

The three Wisconsin Nonattainment Areas have repeatedly failed to attain the 2015 Ozone Standard. The Areas were first designated as nonattainment with a "Marginal" classification in 2018 and an attainment deadline of August 3, 2021. 83 Fed. Reg. 25776, 25845 (June 4, 2018). The Areas failed to meet the 2015 Ozone Standard by the Marginal attainment deadline and were automatically reclassified by operation of law to Moderate, with a new attainment deadline of August 3, 2024. 87 Fed. Reg. 60897, 60925 (Oct. 7, 2022). The Areas again failed to attain the standard by the Moderate deadline and were subsequently reclassified by operation of law to Serious in the challenged Reclassification Action, with a new attainment deadline of August 3, 2027. 89 Fed. Reg. at 101905.

The Clean Air Act provides that EPA can <u>only</u> consider an area's design

value to determine compliance with the NAAQS. 42 U.S.C. § 7511(b)(2)(A). A design value is the average of the fourth-highest 8-hour concentration of ozone in a year, averaged over a 3-year period, meaning that attainment must occur no later than December 31 of the year prior to the attainment date. *See* 40 C.F.R. Part 50, Appendix I. That means EPA looked at the 2021-2023 design value[3] for the Wisconsin Areas to determine compliance with the attainment deadline of August 3, 2024. The table below shows the calculations for select monitors in the three Nonattainment Areas' 2023 design values[4] in EPA's Reclassification Action:

| AQS Site ID | Nonattainment Area (County) | Fourth highest daily maximum 8-hour average ozone concentration (ppb) | | | 2021-2023 design value (DV) (ppb) |
|---|---|---|---|---|---|
| | | 2021 | 2022 | 2023 | |
| 55-117-0006 | Sheboygan | 73 | 77 | 82 | **77** |
| 55-079-0085 | Milwaukee | 72 | 74 | 76 | **74** |
| 55-059-0019 | Kenosha | 79 | 70 | 84 | **77** |

On December 17, 2024, because the 2023 design values for each area violated the 2015 Ozone Standard, EPA determined that the Areas had failed to attain by the August 3, 2024, deadline. 89 Fed. Reg. at 101905. The Clean Air Act thus compelled only one possible outcome: reclassify the Nonattainment Areas to

[3] For simplicity, the remaining references to the design value in this Motion will be just to the last year of the three-year calculation. So a "2023 design value" means the design value comprised of the years 2021, 2022, and 2023.
[4] Reclassification Action, Tables 4, 6, and 8. *See* 89 Fed. Reg. at 101904-05.

Serious. 42 U.S.C. § 7511(b)(2). The upcoming Serious attainment deadline is August 3, 2027. 89 Fed. Reg. 101901, 101902.

## III. Air Quality Continues to Deteriorate in the Three Nonattainment Areas.

About one-third of Wisconsin residents live in the counties comprising the three Nonattainment Areas. Gallagher Decl. ¶ 14, Ex. A. In the Reclassification Action, EPA relied on "certified" air quality data, which refers to the data submitted by Wisconsin—data which the State lead official must attest is "accurate to the best of her or his knowledge." 89 Fed. Reg. 101901; 40 C.F.R. § 58.15(a). More recent, Wisconsin-certified air quality data since 2023 shows that ozone pollution levels in these areas are worsening. Gallagher Decl. ¶¶ 19-21. The graph and table below show ozone design value trends for the three Nonattainment Areas from 2019 through 2025, based on EPA's Ozone Watch tool.[5] Gallagher Decl. ¶¶ 19-21.

[5] U.S. EPA, OZONE WATCH, https://www.epa.gov/outdoor-air-quality-data/ozone-watch (last accessed August 25, 2026).




| AQS Site ID | Nonattainment Area (County) | Design Value (ppb) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2017-2019 | 2018-2020 | 2019-2021 | 2020-2022 | 2021-2023 | 2022-2024 | 2023-2025 |
| 55-117-0006 | Sheboygan | **75** | **75** | **72** | **75** | **77** | **78** | **77** |
| 55-059-0019 | Kenosha | **75** | **74** | **74** | **75** | **77** | **78** | **79** |
| 55-079-0085 | Milwaukee | 69 | 70 | 70 | **73** | **74** | **74** | **74** |
| 55-101-0020[6] | Racine | **74** | **73** | **73** | **75** | **74** | **74** | **76** |

[6] Because of the D.C. Circuit's 2020 decision partially vacating EPA's designations for the Wisconsin area, EPA drew a larger boundary for the Milwaukee nonattainment area to include Racine County, which is where AQS Site ID 55-101-0020 is located (Racine - Payne And Dolan, 4500 Charles St.). 86 Fed. Reg. 31438 (June 14, 2021); *Clean Wisconsin v. EPA*, 964 F.3d 1145 (D.C.

Based on EPA's Benefits Mapping and Analysis Program ("BenMAP"), the public health costs associated with 2015 Ozone Standard violations are significant in the three areas. Ozone levels above the federal standard in these three Nonattainment Areas results in 2 to 4 excess deaths per year and health harms ranging from $88,600,000 to $112,000,000 annually. Gallagher Decl. ¶¶ 15-16.

## STANDARD OF REVIEW

The Court can always revisit whether an existing stay is still justified. *Aristy-Rosa v. Att'y Gen. of the U.S.*, No. 25-1490, 2026 WL 2363039, at *2 (3d Cir. Aug. 14, 2026) ("A stay is not forever. Circumstances change."); The party seeking continuation of a stay "bears the burden of showing his entitlement to a stay." *Latta v. Otter*, 771 F.3d 496, 498 (9th Cir. 2014). Because the existing stay of the Reclassification Action was entered without adversarial briefing or a decision by the Court on the merits of a stay, the Court should apply the same test when deciding whether to continue the stay.

Generally, courts will consider four factors when assessing whether a stay is appropriate: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the

---

Cir. 2020);

other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder,* 556 U.S. 418, 426 (2009); *see also Venckiene v. United States*, 929 F.3d 843, 853 (7th Cir. 2019) (applying *Nken* stay test). "The [stay] standard calls for equitable balancing, much like that required in deciding whether to grant a preliminary injunction or a temporary restraining order." *Venckiene*, 929 F.3d at 853. Ultimately, "[a] stay is not a matter of right, and its issuance depends on the circumstances of a particular case." *Nken*, 556 U.S. at 434. These same factors are at issue when courts are considering whether to dissolve a stay. *See Mass. Bldg. Trades Council v. U.S. DOL (In re MCP No. 165)*, 21 F.4th 357, 368 (6th Cir. 2021) (discussing the traditional stay factors in the context of a motion to dissolve the stay).

Summary disposition is an appropriate tool "when the position of one party is so clearly correct as a matter of law that no substantial question regarding the outcome of the appeal exists." *Williams v. Chrans*, 42 F.3d 1137, 1139 (7th Cir. 1995) (citing *Joshua v. United States*, 17 F.3d 378, 380 (Fed. Cir. 1994)). Put another way, summary disposition may be used when "any issues which could be raised are insubstantial and … further briefing would not be helpful to the court's consideration of the issues." *Walker v. Nat'l Collegiate Athletic Ass'n*, No. 19-2638, 2019 WL 8058082, at *1 (7th Cir. Oct. 25, 2019); *Mather v. Village of*

*Mundelein*, 869 F.2d 356, 357 (7th Cir. 1989) (*per curiam*) (stating that this Court can decide case on motions, papers, and the record where briefing would not assist the court and where no member of the panel believes that briefing or argument would be useful).

**ARGUMENT**

Petitioner Wisconsin cannot show that the circumstances underlying this case justify a continued stay of the Reclassification Action. First, Wisconsin has not shown likelihood of success on the merits because the Clean Air Act requires automatic reclassification for any areas that fail to meet the NAAQS, thus making EPA's Reclassification Action non-discretionary and obviating the need for public notice and comment. Second, the Public Interest Organizations and their members are substantially and irreversible injured by a continued stay of the Reclassification Action. Third, the public interest in clean air supports dissolving the stay and ensuring that Wisconsin implements the Action's more rigorous environmental protections. Finally, Wisconsin cannot use the costs of compliance with the law to justify a stay because such costs are not irreparable injuries. Dissolution of the stay will not harm EPA because the agency would have to eventually defend the Reclassification Action either way. Therefore, the *Nken* factors all favor dissolution of the stay.

## I. Petitioner Wisconsin Has No Chance of Success On the Merits.

### A. The Clean Air Act Compelled Reclassification By Operation of Law, Meaning EPA Lacked Discretion to Promulgate Any Action But the Reclassification Action.

When any nonattainment area's air quality fails to attain a national ozone standard by the applicable attainment deadline, the Clean Air Act compels only one possible outcome: automatic reclassification by operation of law to the next more stringent classification level. 42 U.S.C. § 7511(b)(2). The Act's "Reclassification upon failure to attain" provision, often referred to as "mandatory reclassification," states in relevant parts: "Within 6 months following the applicable attainment date… for an ozone nonattainment area, the Administrator shall determine, based on the area's design value (as of the attainment date), whether the area attained the standard by that date." *Id*. § 7511(b)(2)(A). The provision then commands that "any area that the Administrator finds has not attained the standard by that date shall be reclassified by operation of law… to… the next higher classification for the area." *Id*.

Based on air quality data, the three Nonattainment Areas failed to attain the 2015 Ozone Standard by the August 3, 2024, Moderate attainment deadline. 89 Fed. Reg. at 101901-02. The Clean Air Act thus compelled only one possible outcome: automatic reclassification by operation of law from Moderate to Serious

nonattainment. *Id*. As explained in the Reclassification Action, EPA determined that there was "good cause for making this final agency action without prior proposal and opportunity for comment because [their] action to determine whether these areas have attained the NAAQS by the attainment date is governed, per CAA section 181(b)(2)(A), solely by area design values as of that date." *Id*. at 101905. In other words, automatic reclassification in the present case was mandated by the plain language of the Clean Air Act.

Congress afforded EPA's no discretion in this context. The Act states that mandatory reclassification by operation of law is based solely on the monitored air quality in a nonattainment area and the resulting design value at the time of the attainment deadline. 42 U.S.C. § 7511(b)(2). And EPA confirms this interpretation of the Act, explaining that "[t]he area design values relied upon in this determination are calculations based on the certified air quality monitoring data governed by EPA's regulations and involve no judgment or discretion." 89 Fed. Reg. at 101905-06. EPA's reference to "certified" air quality data[7] refers to the

[7] The certified air quality data submitted by Wisconsin is part of the administrative record for the Reclassification Action. *See* Certified Index to the Administrative Record, ECF No. 28, at page 4-5 (filed April 27, 2026) (citing "2021 Wisconsin Ambient Air Monitoring Early Data Certification for Select Ozone Monitors," Document ID EPA-R05-OAR-2024-0546-0005; "2021 Wisconsin Ambient Air Monitoring Data Certification – Criteria Network Data," Document ID EPA-R05-OAR-2024-0546-0008; "2022 Wisconsin Ambient Air Monitoring Data

data annually submitted by Wisconsin—data which the State lead official must attest is "accurate to the best of her or his knowledge"— to EPA and meets the certification requirements found in 40 C.F.R. § 58.15. 40 C.F.R. § 58.15(a) (requiring the State to submit monitored ambient concentration data from all monitors in the state).

The history of Clean Air Act Section 7511(b)(2) explains why Congress removed EPA's discretion. The 1990 Amendments to the Clean Air Act included Section 7511, which "abandoned the discretion-filled approach of two decades prior in favor of more comprehensive regulation." *S. Coast Air Quality Mgmt. Dist. v. E.P.A.*, 472 F.3d 882, 887 (D.C. Cir. 2006). Accordingly, "Congress adopted a graduated classification scheme that prescribed mandatory controls that each state must incorporate into its SIP." *Id*. (noting specifically that Congress was "[n]o longer willing to rely upon EPA's exercise of discretion"). Thus, "[a]reas that failed to meet a deadline were to be reclassified to a higher classification automatically." *Id*.

---

Certification – Criteria Network Data," Document ID EPA-R05-OAR-2024-0546-0011; "2023 Wisconsin Ambient Air Monitoring Data Certification – Criteria Network Data," Document ID EPA-R05-OAR-2024-0546-0014). EPA's calculation of design values for the Areas at issue was based on this certified data submitted by Wisconsin. 89 Fed. Reg. at 101904-06; *see also* Document ID EPA-R05-OAR-2024-0546-0001.

At bottom, Wisconsin certified the accuracy of its air quality data, EPA relied on that data to calculate the Nonattainment Areas' design values, and those values showed all three Areas failed to attain by the August 3, 2024, deadline. Thus, the Clean Air Act commanded only one possible outcome: reclassification of the Areas from Moderate to Serious.

### B. Wisconsin Cannot Raise Any Issue Warranting Vacatur of the Reclassification Action.

There are no rationales that would justify vacating the Reclassification Action, largely because that Action merely implements the Clean Air Act's mandatory reclassification scheme. Thus, any challenges Wisconsin could raise to the underlying monitoring data used in the Reclassification Action are untimely.

Wisconsin instead only raises two irrelevant challenges to the Reclassification Action: (1) it argues that EPA did not comply with the notice-and-comment requirements of the Administrative Procedure Act ("APA"), and (2) that EPA's final rule is arbitrary and capricious and thus violates the APA because it failed to account for out-of-state ozone as part of its determination. State of Wisconsin's Mot. to Stay the Final Rule at 12-20, ECF No. 12 (filed Aug. 15, 2025). Both challenges have no chance of success on the merits.

On whether EPA should have conducted notice-and-comment rulemaking, there is good cause under the APA to excuse such procedures. 5 U.S.C. §

533(b)(4)(B) (excusing public notice and comment "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest"). The Clean Air Act states that reclassification must be based only on the Wisconsin-certified air quality data, which showed that the Areas did not meet the 2015 Ozone Standard. 42 U.S.C. § 7511(a)(2); 89 Fed. Reg. at 10190410190-06. The mandatory reclassification provision of the Act does not allow EPA to consider other issues when reclassifying an area. Thus, notice and comment procedures were unnecessary and impracticable here.

EPA offered a reasoned explanation for forgoing notice and comment procedures which is consistent with the APA's statutory command. 89 Fed. Reg. at 101905-06 (stating that "[t]he area design values relied upon in this determination are calculations based on the certified air quality monitoring data governed by EPA's regulations and involve no judgment or discretion"). EPA has complied with its obligations under the Clean Air Act and the APA as they relate to this Reclassification Action. And, alternatively, any error is harmless given the Act's constraint on what EPA can consider. *See Liapis v. Bisignano*, 180 F.4th 946, 953 (7th Cir. 2026) ("The harmless error standard applies to judicial review of administrative decisions.").

When an agency makes "policy judgments where no factual certainties exist or where facts alone do not provide the answer," a court reviews that action to ensure the agency adequately explained itself and the procedures used. *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1147 (D.C. Cir. 1980) (citing *Indus. Union Dep't, AFL-CIO v. Hodgson*, 499 F.2d 467, 475-76 (D.C. Cir. 1974). But here, factual certainty does exist, and the facts alone do provide the answer: Wisconsin-certified air quality data showed that the three Nonattainment Areas did not meet the 2015 Ozone Standard; therefore, the Act compelled reclassification. Because the statute compels the Reclassification Action, the lack of notice-and-comment is permissible.

Wisconsin's other challenge has no chance of success either. The Reclassification Action did not need to account for out-of-state ozone transport (i.e., ozone pollution emitted upwind and traveling interstate to Wisconsin's air monitors) because the Clean Air Act does not allow EPA to take that information into account when making a reclassification decision. 42 U.S.C. § 7511(b)(2). The Act does not exempt pollution from any source, be it interstate air pollution or otherwise, from mandatory reclassification. Thus, EPA cannot be faulted for not accounting for facts that would not—and cannot—change the outcome. The Act would have compelled the same outcome no matter the nature or amount of

interstate air pollution. *Lead Indus. Ass'n, Inc*, 647 F.2d at 1147.

While Wisconsin is understandably concerned about interstate air pollution, and while the Act's mandatory reclassification provision provides no reprieve based on interstate air pollution, the Act does provide other means to address this issue. For example, under the Act's "Good Neighbor" provision, upwind states that significantly contribute ozone pollution to Wisconsin's Nonattainment Areas must adopt pollution restrictions that reduce those emissions. 42 U.S.C. § 7410(a)(2)(D); *State of Wisconsin v. EPA*, 938 F.3d 303, 313 (D.C. Cir. 2019) ("[U]nder the terms of the Good Neighbor Provision, upwind States must eliminate their significant contributions."). Wisconsin can also submit a Clean Air Act Section 126(b) petition to EPA, which allows: "Any State or political subdivision [to] petition the [EPA] Administrator for a finding that any major source or group of stationary sources emits or would emit any air pollutant in violation of the prohibition of [the Good Neighbor provision]." 42 U.S.C. § 7426(b). Wisconsin cannot do is commandeer the Act's narrow reclassification provision to address interstate pollution, especially considering that there are other mechanisms in the Act to address those issues.

At bottom, no issue thus far raised by Wisconsin can succeed on the merits nor could any other issue not yet raised. Therefore, the stay should be dissolved so

that the planning needed to achieve much-needed emission reductions required by the Reclassification Action can begin. For the same reasons, because the chance of success on the merits is nonexistent, the Court should summarily affirm the Reclassification Action and summarily dismiss the State's petition for review.

## II. The Other Stay Factors Support Dissolution and Summary Disposition.

### A. The Public Interest Organizations and Their Members Suffer Substantial Harm Absent Dissolution of the Stay.

Public Interest Organizations and their members will be substantially and irreversibly harmed if the stay is not dissolved and the petition for review summarily dismissed. As explained above and in the Reclassification Action, the three Nonattainment Areas consistently failed to attain the 2015 Ozone Standard, which is a public health-based standard intended to protect the public from unhealthy air pollution. *Supra* BACKGROUND § II-III. The ozone air quality in the Areas continues to worsen over time, meaning that increasingly more stringent action is necessary to reduce ozone air pollution in the region. *Id.*; Gallagher Decl. ¶¶ 19-21. The Nonattainment Areas are home to thousands of the organizations' members, who all continue to suffer harm from high ozone pollution. Kelly Decl. ¶ 11, Ex. B; Ward Decl. ¶ 14, Ex. F; Gallagher Decl. ¶ 13-14.

Public Interest Organizations' members have suffered and continue to suffer ongoing injuries stemming from ozone pollution in these areas. *See* Hillringhouse

Decl. ¶¶ 4-7, 15-18, Ex. G; Radke Decl. ¶¶ 7-11, Ex. D; Ritger Decl. ¶¶ 5-10, Ex. E. For example, Clean Wisconsin member Rebecca Clarke notices that, when ozone levels are high, she must stop taking walks with her dogs, gardening, and visiting Lake Michigan's beaches and instead take refuge indoors because "physical activities that are normally easy become significantly more difficult." Clarke Decl. ¶¶ 15-18, Ex. C. "On days when ozone levels are high, I experience a heaviness in my chest, breathing difficulties, and an unusually fast heartbeat." *Id*. ¶ 16.

The Reclassification Action, if the stay is dissolved, could remedy these members' injuries because it will require Wisconsin to take steps to reduce emissions of ozone precursors in the three Nonattainment Areas. Clarke Decl. ¶¶ 14-26; Hillringhouse Decl. ¶¶ 4-7, 15-18; Radke Decl. ¶¶ 9-13; Ritger Decl. ¶¶ 5-10. The health harms to the organizations' members and others living in the Nonattainment Areas are significant: ozone levels above the 70 parts-per-billion standard result in an average of 2 to 4 excess deaths occur annually. Gallagher Decl. ¶¶ 15-16. And the annual public health harms from this excess pollution range from $88,600,000 to $112,000,000. *Id*. There is a real, human cost to the ongoing air quality problems in these areas. If this Court dissolves the stay and summarily dismisses the petition for review, the human cost of this ozone pollution

can be redressed.

### B. The Public Interest in Clean Air and Healthy Communities Strongly Supports Dissolution of the Stay.

As explained above, air quality is degrading in these Nonattainment Areas. *Supra* BACKGROUND § II. In the face of persistent and worsening ozone pollution levels, the Reclassification Action and resulting Serious nonattainment classification would trigger ten new requirements and restrictions that would lead to reductions in ozone pollution in the Areas. *See* 42 U.S.C. § 7511a(c). Thus, the public's interest in clean air—the purpose underpinning the Clean Air Act's ozone program—strongly supports dissolving the stay. *See Sierra Club v. Franklin Cnty. Power of Illinois, LLC*, 546 F.3d 918, 936 (7th Cir. 2008) (explaining that public interest would support the injunction of an air permit that could result in "decreased emissions and improved public health, which would further a stated goal of the Clean Air Act."); *see also* 42 U.S.C. § 7401(b)(1) (declaring that Clean Air Act's purpose is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare").

As discussed above, over just a short period of exposure, ozone pollution can cause a range of lasting and irreversible health impacts and is especially harmful to certain at-risk populations like children, older adults, and people with respiratory disorders. *Supra* BACKGROUND §§ I, III; ARGUMENT § II.A. The public,

therefore, has a vested interest in minimizing ongoing ozone pollution in the Nonattainment Areas. As noted above, there are an estimated 2 to 4 excess deaths annually and public health harms up to $112,000,000 incurred per year due to ozone levels above the standard. Gallagher Decl. ¶¶ 15-16. These harms show why the public interest strongly supports dissolution of the stay.

The three Nonattainment Areas are fast approaching the next attainment deadline of August 3, 2027, after which the Areas will be reclassified to Severe nonattainment if they do not meet the federal standards. Thus, necessary pollution reductions are needed now to meet the 2015 Ozone Standard, dissolving the stay and upholding the Reclassification Action ensures that the State will take appropriate steps to actively reduce ozone pollution in the region.

### C. Wisconsin Faces No Irreparable Injury, Only Ordinary Costs of Complying with the Valid Exercise of Federal Law.

Wisconsin will face no irreparable injury if the stay is dissolved. In its motion to stay the Reclassification Action, Wisconsin indicated that the Action will require it to spend staff time and resources to prepare a revised state implementation plan to incorporate Serious nonattainment classification requirements. Mot. to Stay the Final Rule at 20-21, ECF No. 12. However, compliance costs associated with the Reclassification Action would not typically be considered irreparable injuries justifying a stay. *Am. Hosp. Ass'n v. Harris*, 625

F.2d 1328, 1331 (7th Cir. 1980) (noting that "injury resulting from attempted compliance with government regulation ordinarily is not irreparable"). Wisconsin's other alleged injury concerning a loss of tax revenues due to compliance with the law requires a long chain of speculation and the unknown acts of third parties. *Cf. Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1188 (7th Cir. 2023) ("[A] mere possibility of irreparable harm will not suffice."); *Com. of Pa., by Shapp v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) (allegations of tax revenue loss insufficient to demonstrate standing). Even if the speculated events occur in the order alleged, they will not occur until potentially years *after* Wisconsin starts implementing the Reclassification Action's requirements, thus not irreparable and can be planned for.

Wisconsin has known about its impending obligations under the Serious nonattainment reclassification since December 2024, and likely sooner, if you consider that the Reclassification Action is based on the 2023 design value for the areas, and preliminary design values showed violations of the 2015 Ozone Standard by the end of August 2023 in all three Nonattainment Areas. Plus, as the entity responsible for certifying air quality data, the State was aware of the stagnant or worsening ozone levels over the few years leading up to the 2023 design value and the Reclassification Action. Wisconsin could have begun

planning for the cost, time and resources needed to ensure compliance well in advance of the Reclassification Action.

### III. To the Extent the Court Deems It Necessary, The Abeyance Should Be Lifted to Dissolve the Stay and Summarily Dismiss the Petition for Review, or, Alternatively, Order Expedited Briefing.

Abeyances are at the sole discretion of the courts, so this Court can, on this Motion, take the case out of abeyance to dissolve the stay and summarily dismiss Wisconsin's petition for review. In the Clean Air Act, Congress "emphatically declared a preference" for "immediate" judicial review of challenges to EPA actions. *Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) (quoting *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007)).

If the Court determines that additional briefing is required in lieu of summary disposition, the Court should lift the abeyance and order expedited briefing for the reasons explained above. Expedited briefing is warranted here because of the worsening trajectory of ozone pollution levels in the Nonattainment Areas and the fast-approaching August 3, 2027, Serious attainment deadline. Resolution is, therefore, needed expeditiously, so that much-needed emission reductions can be planned and implemented before next year's ozone season.

While EPA and Wisconsin requested abeyance based on EPA's last-minute

reconsideration of the Reclassification Action in late July, that alone does not support continuing the abeyance. Nor does judicial economy favor keeping this case in abeyance pending a reconsideration action that, under the Act's plain language, cannot result in any other outcome.

As explained above, EPA's ministerial role in implementing the Clean Air Act's mandatory reclassification provision is limited to consideration solely of the Wisconsin-certified air quality data and resulting design values. *Supra* ARGUMENT § I. So air quality data alone decides the outcome of this case, and EPA's decision to grant reconsideration cannot change that outcome. As a result, there is nothing of substance to reconsider, and no reconsideration proceeding can change what happens the Clean Air Act commands here: the Nonattainment Areas failed to meet the 2015 Ozone Standard, thus compelling mandatory reclassification to Serious nonattainment. *Supra* ARGUMENT § I.

## CONCLUSION

For the foregoing reasons, the Public Interest Organizations respectfully request that this Court grant this Motion, dissolve the judicial stay of the Reclassification Action, and summarily affirm the Action by summarily dismissing the petition for review.

Dated: August 27, 2026

*/s/ Jeffrey Hammons*
Jeffrey Hammons
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(771) 241-6481
jhammons@catf.us

*Counsel for Respondent-Intervenor Applicant Clean Wisconsin*

*/s/ Priyam Desai*
Priyam Desai
Sierra Club
2101 Webster St., Ste. 1300
Oakland, CA 94612
(415) 294-0910
priyam.desai@sierraclub.org

*Counsel for Respondent-Intervenor Applicant Sierra Club*

**CERTIFICATE OF COMPLIANCE**

I certify that this motion complies with the type-volume limitation of Federal Rules of Appellate Procedure 27(d)(1)-(2) because, excluding the parts exempted under Federal Rules of Appellate Procedure 27(d)(2) and 32(f), it contains 5139 words. Per Federal Rule of Appellate Procedure 27(d)(1)(E), I certify that this motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New York Times font. I further certify that this motion has been scanned for viruses and is virus-free.

Dated: August 27, 2026

*/s/ Jeffrey Hammons*
Jeffrey Hammons
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(771) 241-6481
jhammons@catf.us

## CERTIFICATE OF SERVICE

I certify that on August 27, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*/s/ Jeffrey Hammons*
Jeffrey Hammons
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(771) 241-6481
jhammons@catf.us